Filed 1/30/23

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>ISRAEL FABIAN FUENTES,<br><br>    Defendant and Appellant. | A162315<br><br>(Sonoma County Super Ct.<br> No. SCR-736368-1) |

Israel Fabian Fuentes pleaded guilty to inflicting corporal injury on Jane Doe, a person with whom he had a dating relationship, and admitted inflicting great bodily injury on the victim in circumstances involving domestic violence, pursuant to a plea agreement that called for probation with a suspended sentence of eight years. After he was released pending sentencing, he was found to have violated a provision in the plea agreement specifying that if he committed another crime, violated a condition of release or willfully failed to appear for sentencing, he would be sentenced unconditionally, and was sentenced to a nine-year prison term. He contends the violation cannot be sustained because the condition he was found to have violated was unconstitutionally vague and the evidence did not support finding a violation. We disagree and affirm the trial court's finding of a

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

1

violation. We agree, however, with Fuentes's additional contention that post-sentencing statutory amendments require a remand for resentencing.

## BACKGROUND

### I.

### *The February 2020 Offense and Protective Order*

#### A.    The Offense

As described in the probation report, officers were dispatched to a reported domestic dispute at about 6:55 p.m. on February 21, 2020. When the first officer arrived at the scene, Doe's roommate ran out and reported that Fuentes was actively striking Doe. Inside, the officer heard yelling and found Fuentes and Doe in a bathroom. Doe's face was bloody, tears were rolling down her cheeks and she appeared frightened. Fuentes was blocking Doe from leaving the bathroom and appeared heavily intoxicated, but he was compliant with the officer's verbal commands. He was detained in handcuffs and escorted out of the apartment. As the officer escorted Fuentes out of the apartment, he noticed a small child crying in a corner of the living room. In the bathroom, officers noted that the toilet was "completely uprooted from the ground and moved to the left," there was water on the ground from the toilet being broken, and there was a puddle of blood approximately five feet in front of the toilet.

Doe had visible bruising and a knot forming on the left side of her eye, dried blood on her arms and hands from wiping her face, blood on her pants, bruising starting to form on her inner right forearm and dried blood on her lips that appeared to be coming from her top gums. The officer noted that her "front top row of teeth were 'completely disfigured,' and described, 'Her teeth were pushed back towards her throat and seemed to be coming loose from her gums and nearly falling out.' " Doe's speech was impaired as a result of her injuries and she spoke with a lisp.

2

Doe told the officers she and Fuentes had been in a dating relationship for 20 years and the child inside was their three-year-old son. She said Fuentes became angry when he dropped her off at work that morning because he believed he saw her walking with another man. At home, he confronted her about this while she was seated on the toilet, standing over her and yelling, then punching her 10 to 15 times in the face, causing her to fall to the ground. He then kneed her in the face four times, causing the injuries to her mouth. The altercation ended when a police officer intervened. Doe said they had had prior domestic disputes but denied any had been physical.

Fuentes claimed he and Doe had a verbal argument when he confronted her about talking with a man at work; Doe pushed him and he pushed her back; and they both fell to the ground. He denied striking Doe and said her injuries were caused when they fell to the ground and wrestled.

## B.     The Charges and Criminal Protective Order

On February 25, 2020, a criminal complaint was filed charging Fuentes with one count of willful infliction of corporal injury on a person with whom he had a dating relationship (Pen. Code, § 273.5, subd. (a)),[1] with an allegation that Fuentes personally inflicted great bodily injury upon the Doe in circumstances involving domestic violence (§ 12022.7, subd. (e); and one count of false imprisonment (§ 236). On the same date, the court issued a "Criminal Protective Order—Domestic Violence" (Judicial Council Form CR-160) pursuant to section 136.2 that prohibited Fuentes from having any

---

[1] Further statutory references are to the Penal Code except as otherwise specified.

3

contact with Doe. Probation was summarily revoked in a prior case (SCR-665418-1).[2]

On April 20, 2020, the criminal protective order was modified to permit Fuentes "peaceful contact" with Doe. The court told Fuentes, "You are to have only peaceful contact. That means not to harass, strike, threaten, assault, follow, stalk, destroy property, et cetera, for the protected party." The protective order states that the defendant "must not harass, strike, threaten, assault (sexually or otherwise), follow, stalk, molest, destroy or damage personal or real property, disturb the peace, keep under surveillance, or block movements of the protected persons named above."

## C.    The Plea Agreement

On May 18, 2020, Fuentes pleaded guilty to the count of willful infliction of corporal injury and admitted the great bodily injury enhancement allegation. He admitted violating his probation in SCR-665418 by committing the new offense, and probation in SCR-665418 was terminated unsuccessfully. His plea agreement in the present case specified a negotiated disposition including three years' probation with one year served in county jail; a waiver of pre-plea custody credits; imposition of a suspended prison sentence of eight years, four years for the willful infliction of corporal injury and four years for the great bodily injury enhancement; and dismissal of the false imprisonment count. It was agreed that, in order to allow Fuentes to be present for the impending birth of his and Doe's child, he would be released from custody "on enhanced PTR with alcohol monitor" pending sentencing, at

---

[2] In the prior case, on February 24, 2016, Fuentes pleaded no contest to recklessly fleeing a pursuing peace officer (Veh. Code, § 2800.2), driving with a blood alcohol content of .08 with two prior convictions for driving under the influence with the last 10 years (*id.,* §§ 23152, subd. (b), 23546), and resisting a peace officer (§ 69).

4

which time he would be remanded to serve any remaining time.  Sentencing was set for July 30.

The court informed Fuentes he would be released on "enhanced supervision" under terms and conditions the court enumerated on the record. The court then asked if there was a stay-away issue with Doe and when the prosecutor said there was not, the court stated, "I'm going to put as a condition of his Pretrial Release that he is only to have peaceful contact with Jane Doe."  Defense counsel told the court, "on the last court date that was actually officially changed to that anyway."

Fuentes's plea agreement specified, in paragraph 19:  "I understand that if pending sentencing I commit another crime, violate any condition of a Supervised O.R. release, or willfully fail to appear for my sentencing hearing, this agreement will be canceled, I will be sentenced unconditionally, and I will not be allowed to withdraw my guilty/no contest plea(s)."  This provision is known as a *Cruz* waiver.  (*People v. Cruz* (1988) 44 Cal.3d 1247.)[3]  The court advised Fuentes that this paragraph of the form "says if you commit a new law violation, you fail to report to Probation or fail to appear at your hearing, this deal is off the table."  Fuentes was asked if he understood and said he did.

---

[3]  *Cruz* held that when the trial court withdraws its approval of a plea bargain because the defendant fails to appear for sentencing, the defendant retains the protection of section 1192.5, which provides that when a trial court disapproves a plea bargain, the defendant must be permitted to withdraw his or her plea.  (*Cruz, supra,* 44 Cal.3d at p. 1249.)  *Cruz* noted that if a properly advised defendant expressly waived this right at the time his or her plea bargain was accepted and then failed to appear for sentencing, the court could "withdraw its approval of the defendant's plea and impose a sentence in excess of the bargained-for term."  (*Id.* at p. 1254, fn. 5.)

## II.

### *The June 2020 Violation*

#### A.     The June 2020 Argument

On June 25, 2020, the probation officer filed a request to terminate Fuentes's pretrial supervision due to a "new law violation."  The request stated that Doe had reported a violation of Fuentes's order to have peaceful contact with her in that on June 23 he yelled at her and withheld access to her phone and internet access.  It further stated that Fuentes was determined to have violated his criminal protective order "as the victim was in fear of [him] and he was preventing her access to call for help" and that Fuentes was subsequently arrested for misdemeanor violation of a protective order (§ 273.6, subd. (a)) and violation of Pretrial Supervision (failing to obey all laws and maintain peaceful contact with the victim).

At a hearing on October 7, 2020, Doe testified that on June 23, 2020, she was living in Santa Rosa with her four-year-old son, infant daughter (born in May) and a roommate.  Fuentes had returned to the home on May 18, after being in jail.  On June 23, Doe was nervous about the upcoming weekend because the roommate was supposed to go to visit her family and Doe was "in a shock state of being alone with" Fuentes.  Doe explained that this would have been the first time since the February incident that the roommate would not be at home; Doe and Fuentes had not had any therapy; and she was "nervous about that, a little bit scared," because she did not know if she could "trust him alone by myself."  Doe was worried there would be no one to help her if something happened between her and Fuentes, and that she would not have access to her phone or the internet.  Asked about the latter, she said she did not know "his intentions, if they'll be good or bad on the weekend with us being the first time alone."

6

On the morning of June 23, Doe and Fuentes were talking in the living room while the children were asleep and had "a little conflict about the computer": He had found things on the computer that made him think she was cheating on him. Doe testified that they argued "for a little bit, but not, like, loud and excessive . . . more like just an upset tone"; it was "a little bit of, like, a raised tone, but not like we're yelling at each other, but just—just the tone of it was just a little deep." When asked if Fuentes yelled at her, Doe said he "[j]ust raised his voice a little bit because he was just frustrated"; the sound was "[n]ot like shouting, but just more like he said that, like, I don't understand why you just can't tell me the truth, kind of like in a deeper voice." The court noted for the record that Doe "demonstrated what she meant by actually elevating her voice."

Doe testified that as they were sitting next to each other talking, she flinched when Fuentes raised his arms to stretch and she "wasn't sure if he was going to . . . surprise me, like, a hit or whatever."[4] After this, he was "a little bit upset with himself" because "he didn't want [her] to be scared," and he said he was sorry. Fuentes told Doe he was sorry for what happened in February but also told her, in reference to that incident, that "maybe [he] should have just been a little bit harder on [her]." She was "just a little bit scared" when he said this; she did not know what he meant or what "his intentions were" and he did not explain "why he would say something like that."

Doe testified that the argument started around 8:30 a.m. and lasted until about 12:45 or 12:50 p.m. About 1 p.m., Doe went to the Family Justice

---

[4] Doe testified that Fuentes "went over like this to stretch" and the court described for the record that Doe "demonstrated raising both of her arms up above her head."

Center (FJC), wanting to talk to the person she knew there to find out "the next step I could take." Doe "needed advice about what to do," as she and Fuentes were not going to therapy, she wasn't taking "therapy classes" and she "didn't know how to handle this on my own because this is all new to me." Doe was upset with Fuentes over the "accusations that [she] was receiving," "frustrated" because "no matter what [she] was saying, it wasn't what he wanted to hear," and they "exchanged words and stuff." Doe testified that she "didn't want to . . . hear him out, of what he had to say anymore. So [she] just got uncomfortable. And to end it the way [she] wanted to end it was to go to the Family Justice Center and to just get away from [Fuentes] because [she] didn't want to talk with him about anything."

A police officer came to the FJC to speak with Doe. At the hearing, Doe testified that she was honest with the officer and acknowledged telling him that Fuentes was "not peaceful"; that she "got scared because [she] thought he was going to hurt [her]"; that Fuentes "yelled at [her] for 10 minutes"; and that he "was withholding [her] phone and Internet access." She testified that Fuentes was keeping her money away from her, in a place too high for her to reach, and said, "[i]f I need to, I ask for it." Doe told the officer she wanted either Fuentes or herself to be out of the house "until we can figure all this out with it getting more conflict [*sic*] and more tension in the home," and she testified that she did not feel comfortable returning home if only she and Fuentes were there.

At the hearing, the prosecutor asked Doe whether she felt afraid when she left to go to the FJC and Doe replied, "[m]ore like upset and just furious of knowing that the fact that I was being accused of something that I couldn't even have my own word about of me telling the truth." Asked why she didn't use her cellphone to call her contact at the FJC, she said she "didn't have it at

8

that time" but she did not "want any conflict" so decided she was "just going to leave it. That's fine. You can have it." Asked if she wanted to take her phone with her, she said "[t]hat day, no," and testified that she decided to go to the FJC because she preferred talking in person rather than over the phone. When asked if she was not able to take her phone with her because it was with Fuentes, she said the phone was with him "but it was charging. But I—I'm not concerned about it. A phone is always replaceable." She testified she did not need to use her phone or the computer that day.

On cross examination, Doe testified that her roommate came home for lunch on June 23 and was present for about 25 minutes while Doe and Fuentes were talking, and that she did not ask the roommate for help. She acknowledged that she and Fuentes had one phone for both of them.

## B.    The Court's Ruling

The court found that Fuentes violated the "*Cruz* admonishment" in that his "communication with Jane Doe was less than peaceful. Certainly, not peaceful."

The court further stated its belief "that [Doe] was substantially underplaying the significance of what occurred on June 23rd" and "was probably far more accurate with the officer on the day she reported to the Family Justice Center than she was today," which the court saw as "a reflection of her understanding now what the potential, very serious consequences are that Mr. Fuentes faces as a result of the *Cruz* admonishment violation. The Court found that her testimony was consistent with domestic violence victims, in especially some of the controlling behaviors that were described in trying to make excuses for why those might have happened."

9

Subsequently, at sentencing, the court commented that when Doe testified, "quite frankly, she was terrified. Everything about her was the textbook definition of a domestic violence victim."

On February 2, 2021, the court imposed the aggravated term of four years for the count of inflicting corporal injury (§ 273.5) and the aggravated term of five years for the great bodily injury enhancement (§ 12022.7, subd. (e)), for a total prison term of nine years. The count of false imprisonment was dismissed.

## DISCUSSION

## I.

### *Violation of the Protective Order Supported Finding Fuentes Violated His* Cruz *Waiver.*

Fuentes argues the trial court erred in finding he violated the *Cruz* waiver by engaging in communication with Doe that was not peaceful. As earlier described, the *Cruz* waiver provided that if pending sentencing Fuentes committed another crime, violated any condition of release, or willfully failed to appear for sentencing, his plea agreement would be canceled and he would be sentenced unconditionally. Fuentes maintains that the violation finding could only have been based on a determination that he violated either the court's condition of release requiring him to have only "peaceful contact" with Doe or the protective order prohibiting him from disturbing the peace of Doe. Neither support finding a *Cruz* waiver violation, he argues, because both conditions are unconstitutionally vague. He further argues that the evidence was insufficient to support finding a violation of these conditions.

10

### A.  The Protective Order Was Not Unconstitutionally Vague.
#### 1. *General Principles*

" '[T]he underpinning of a vagueness challenge is the due process concept of "fair warning." ' (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.)  'The rule of fair warning consists of "the due process concepts of preventing arbitrary law enforcement and providing adequate notice to potential offenders" [citation], protections that are "embodied in the due process clauses of the federal and California Constitutions.  (U.S. Const., Amends. V, XIV; Cal. Const., art. I, § 7.)" ' (*In re Sheena K.*, at p. 890.)  The vagueness doctrine bars enforcement of a law ' " 'which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' " ' (*Ibid.*)" (*People v. Kelley* (2022) 76 Cal.App.5th 993, 997 [protective order].)  A condition imposed as part of a protective order or order of release " 'is unconstitutionally vague if it is not " 'sufficiently precise for the [defendant] to know what is required of him, and for the court to determine whether the condition has been violated.' " [Citation.]' " (*People v. Contreras* (2015) 237 Cal.App.4th 868, 884 [probation condition].)  The condition "should be given 'the meaning that would appear to a reasonable, objective reader.' [Citation.]" (*People v. Olguin* (2008) 45 Cal.4th 375, 382.)  We review the constitutionality of the condition de novo.  (*In re J.H.* (2007) 158 Cal.App.4th 174, 183.)

#### 2. *The Meaning of Disturb the Peace in a Domestic Violence Protective Order*

As Fuentes acknowledges, violation of the April 2020 protective order would constitute a "new law violation" within the meaning of the *Cruz* waiver as a contempt of court.  (§ 166, subd. (c)(1)(A).)  The probation officer's request for termination of pretrial supervision stated that Fuentes "violated his Criminal Protective Order as the victim was in fear of the defendant and

11

he was preventing her access to call for help," and the trial court noted at the hearing that "the basis of this alleged violation is . . . a CPO issued on April 20th of 2020," which the court called "a peaceful-contact restraining order."[5]

As earlier indicated, the protective order stated that Fuentes "must not harass, strike, threaten, assault (sexually or otherwise), follow, stalk, molest, destroy or damage personal or real property, *disturb the peace*, keep under surveillance, or block movements" of Doe. (Italics added.) When the order was imposed in April 2020, the court told Fuentes he was "to have only peaceful contact. That means not to harass, strike, threaten, assault, follow, stalk, destroy property, et cetera, for the protected party."

Fuentes contends this provision is unconstitutionally vague because it is not clear which of two possible interpretations of "disturb the peace" was intended in the order, would be understood by the "average citizen," or was used by the court in finding he violated his *Cruz* waiver. In criminal law, the offense of "disturbing the peace" under section 415 has long been defined as " 'disruption of public order by acts that are themselves violent or that tend to incite . . . violence.' " (*Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1145 (*Burquet*); *In re Bushman* (1970) 1 Cal.3d 767, 773 (*Bushman*), disapproved on other grounds in *People v. Lent* (1975) 15 Cal.3d 481, 486, fn. 1.)[6] Disturbing the peace under section 415 may also be based on loud

---

[5] The court's comment was in the context of ruling on an objection when the prosecutor asked Doe whether she had access to a computer on June 23. The court overruled the objection because it viewed computer access as relevant to a provision of the protective order prohibiting "preventing anyone from making a report or contacting law enforcement."

[6] Section 415 no longer uses the phrase "disturb the peace." At the time *In re Bushman* was decided, the statute provided, in pertinent part, " 'Every person who maliciously and willfully disturbs the peace or quiet of any

12

noise and shouting "where there is a clear and present danger of imminent violence" or "where the purported communication is used as a guise to disrupt lawful endeavors." (*In re Brown* (1973) 9 Cal.3d 612, 621.) Under the Domestic Violence Prevention Act (DVPA), however, "the phrase 'disturbing the peace of the other party'" means "conduct that destroys the mental or emotional calm of the other party." (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497 (*Nadkarni*); *Burquet,* at p. 1146.)

The DVPA definition originated with the *Nadkarni* court in the context of determining whether certain conduct could be enjoined under Family Code section 6320, which authorizes issuance of ex parte restraining orders enjoining specified conduct including "disturbing the peace of the other party." "The *Nadkarni* court's definition has been applied consistently since 2009" (*People v. Sorden* (2021) 65 Cal.App.5th 582, 601 (*Sorden*)) and, pursuant to an amendment that became effective on January 1, 2021, section 6320 now expressly includes this definition. (Fam. Code, § 6320, subd. (c); Stats. 2020, ch. 248, § 2.)

Although the present case obviously involves domestic violence (Fam. Code, § 6211),[7] Fuentes contends that the "average citizen" would understand

---

* * * person * * * by tumultuous or offensive conduct * * * is guilty of a misdemeanor.' " (*Id., supra,* 1 Cal.3d at p. 773, quoting then-section 415.) Section 415 has since been amended and now prohibits "unlawfully fight[ing] in a public place or challeng[ing] another person in a public place to fight," "maliciously and willfully disturb[ing] another person by loud and unreasonable noise"; and "us[ing] offensive words in a public place which are inherently likely to provoke an immediate violent reaction." CALCRIM jury instructions on section 415 continue to refer to the offense as "disturbing the peace" (CALCRIM Nos. 2688, 2689, 2690), as do some judicial opinions (e.g., *People v. Morales* (2021) 67 Cal.App.5th 326, 340; *Kon v. City of Los Angeles* (2020) 49 Cal.App.5th 858, 861.)

[7] Family Code section 6211 defines domestic violence as "abuse perpetrated against any of the following persons[,]" including, as relevant

13

the protective order as using "disturb the peace" in the "traditional" section 415 sense, not the DVPA definition, because the restraining order was issued pursuant to section 136.2, not the DVPA. Unlike statutes specifically authorizing orders for the protection of domestic violence victims (Fam. Code, § 6320 [ex parte protective order for person described in Fam. Code, § 6211]; § 1203.097 [protective order where probation granted for crime in which victim is person described in Fam. Code, § 6211]), section 136.2 is not limited to domestic violence cases. Section 136.2 authorizes a court with jurisdiction over a criminal matter to issue a variety of orders for the protection of victims or witnesses (including an order pursuant to Family Code section 6320).

The order in the present case was clearly imposed to protect a victim of domestic violence (Fam. Code, § 6211; see fn. 5, *ante,* p. 12) from further domestic violence in the future. This is evident from the face of the order as well as the circumstances in which it was issued. The Judicial Council has prescribed two forms for mandatory use in issuing criminal protective orders: CR-160, titled "Criminal Protective Order—Domestic Violence"[8] and CR-161,

_____

here, "[a] cohabitant or former cohabitant," "[a] person with whom the respondent is having or has had a dating or engagement relationship," and "[a] person with whom the respondent has had a child."

[8] CR-160 calls for the court to indicate by checkmark whether the order is issued under sections 136.2, 136.2, subdivision (i)(1) [order after conviction for crime involving domestic violence, specified sex offenses or criminal gang participation], 368, subdivision (*l*) [order after conviction of elder/dependent adult abuse], 273.5, subdivision (j) [order after conviction of willful infliction of corporal injury on current or former spouse, cohabitant or person in dating relationship, or mother or father of offender's child], or 646.9, subdivision (k) [order after conviction for stalking], or as a condition of probation under section 1203.097 [protective order as condition of probation where victim is person described in Family Code section 6211]. Here, the box for section 136.2 was checked.

titled "Criminal Protective Order—Other than Domestic Violence."[9] (Cal. Rules of Court, Appendix A, Judicial Council Legal Forms List; Gov. Code, § 68511 [use of forms "prescribed" by Judicial Council is mandatory]; CR-160 [form "adopted for mandatory use"] <https://www.courts.ca.gov/documents/cr160.pdf> [as of Jan. 27, 2023]; CR-161 [form "adopted for mandatory use"] <https://www.courts.ca.gov/documents/cr161.pdf> [as of Jan. 27, 2023].) The order in the present case is on CR-160 and clearly states, "Criminal Protective Order—Domestic Violence." The protective order was initially issued when Fuentes was charged with willful infliction of corporal injury on a person with whom he had a dating relationship (§ 273.5, subd. (a)), with an allegation that appellant personally inflicted great bodily injury upon the victim in circumstances involving domestic violence (§ 12022.7, subd. (e). No reasonable person could question that the protective order addressed domestic violence.

Fuentes points out that the prohibitory language on forms CR-160 and CR-161 is identical: The defendant "must not harass, strike, threaten, assault (sexually or otherwise), follow, stalk, molest, destroy or damage personal or real property, disturb the peace, keep under surveillance, or block movements of the protected persons." He argues that since the Judicial Council used the same language in the forms for domestic violence and non-domestic violence cases, it is "not at all clear" that the Judicial Council intended "disturb the peace" to be interpreted in accordance with the DVPA definition. Fuentes finds further support for his view that CR-160 uses

---

[9] CR-161 calls for the court to indicate by checkmark whether the order is issued under section 136.2, 136.2, subdivision (i)(1), or 646.9, subdivision (k).

15

"disturb the peace" in the section 415 sense in the fact that the Judicial Council included "disturb the peace" among the prohibited activities in both forms before *Nadkarni* adopted the definition that has since been used in cases under the DVPA. As Fuentes explains in his brief, CR-160 was used for all criminal protective orders until, a few years before *Nadkarni* was decided, the Judicial Council limited CR-160 to domestic violence cases and adopted a new form for non-domestic violence cases.[10] We are not convinced, however, that this means the Judicial Council intended the phrase "disturb the peace" in CR-160 to be interpreted consistent with definitions in the section 415 context, to the exclusion of the definition that came to be developed under the DVPA. Indeed, the Judicial Council could not have actually considered the question at the time it created the separate forms, as the DVPA definition

---

[10] Fuentes asks us to take judicial notice of an August 31, 2006 report to the Judicial Council from the Criminal Law Advisory Committee recommending that "the current protective order (form CR-160)" be revised to limit its application to domestic violence cases and a new form, CR-161, be adopted for use in "cases other than domestic violence." (Judicial Council of Cal., Administrative Office of the Courts, Criminal Law Advisory Committee Report to Members of the Judicial Council, *Criminal Law: Criminal Protective Order Forms*, dated August 31, 2006. <https://www.courts.ca.gov/documents/102006ItemA27.pdf> [as of Jan. 27, 2023].) We take judicial notice of the report pursuant to Evidence Code sections 452, subdivision (c), and 459. The report indicates that as of August 31, 2006, one form was used for criminal protective orders.

Another report, dated March 22, 2007, recommended revisions to forms "CR-160, *Criminal Protective Order-Domestic Violence*" and "CR-161, *Other Than Domestic Violence*," thus indicating the separate forms had been adopted prior to March 22, 2007. (Judicial Council of Cal., Administrative Office of the Courts, Administrative Office of the Courts Report to Members of the Judicial Council, *Miscellaneous Technical Changes to the California Rules of Court and Judicial Council Forms*, dated March 22, 2007 <https://www.courts.ca.gov/documents/042707ItemA9.pdf> [as of Jan. 27, 2023].) We take judicial notice of this report as well.

had not yet been adopted.  CR-160 simply continued to use the prohibitory language it had previously used, and the new CR-161 used the same language for orders not involving domestic violence.

In any event, the question is not what the Judicial Council intended when it adopted CR-160 but whether the protective order gave sufficient notice of what conduct would constitute a violation.  To answer this question, context must be considered.  " 'In deciding the adequacy of any notice afforded those bound by a legal restriction, we are guided by the principles that "abstract legal commands must be applied in a specific *context*," and that, although not admitting of "mathematical certainty," the language used must have " '*reasonable* specificity.' " ' "  (*People v. Kelley*, *supra,* 76 Cal.App.5th at p. 997, quoting *In re Sheena K., supra,* 40 Cal.4th at p. 890.)

As we have said, this is plainly a domestic violence case and the protective order was clearly titled "domestic violence."  Aside from its consistent use in the domestic violence context for more than a decade, the DVPA definition of "disturbing the peace" is far better suited to a domestic violence protective order than the section 415 sense of the phrase.  In interpreting "disturbing the peace" as used in Family Code section 6320, *Nadkarni* adopted a commonsense understanding of the terms based on dictionary definitions supplying the "ordinary, usual meaning" of the statutory language:  "The ordinary meaning of 'disturb' is '[t]o agitate and destroy (quiet, peace, rest); to break up the quiet, tranquility, or rest (of a person, a country, etc.); to stir up, trouble, disquiet.' (Oxford English Dictionary Online (2d ed.1989) <http:// www.oed.com> [as of Apr. 24, 2009].) 'Peace,' as a condition of the individual, is ordinarily defined as 'freedom from anxiety, disturbance (emotional, mental or spiritual), or inner conflict; calm,

17

tranquillity.' (*Ibid.*)" (*Nadkarni, supra,* 173 Cal.App.4th at p. 1497.) Accordingly, *Nadkarni* held that "the phrase 'disturbing the peace of the other party' in section 6320 may be properly understood as conduct that destroys the mental or emotional calm of the other party." (*Ibid.*) As *Nadkarni* explained, this definition comports with the DVPA's "goal of reducing domestic violence" and broad protective purpose. (*Nadkarni,* at p. 1498.)

The definition of disturbing the peace developed in the context of section 415 is primarily directed at conduct disrupting public order. "The terms 'disturb the peace' and 'breach of the peace,' which are substantially synonymous, have long been understood to mean disruption of public order by acts that are themselves violent or that tend to incite others to violence." (*Bushman, supra,* 1 Cal.3d at p. 773.) This definition is ill-suited to the domestic violence context, where the issue is not public order but protection of one specific individual from another within a domestic relationship. "The definition of disturbing the peace as set forth in . . . section 415 of the Penal Code (since amended) as set forth in *Bushman, supra,* is not applicable to the meaning of the phrase 'disturbing the peace of the other party' as used in the DVPA." (*Burquet, supra,* 223 Cal.App.4th at p. 1146; *Sorden, supra,* 65 Cal.App.5th at p. 602.)

In *Sorden,* the defendant was prosecuted for contempt of court (§ 166, subd. (c)(1)(B)) due to violation of a previous protective order issued under section 1203.097 that prohibited him from, among other things, disturbing the peace of the protected party. (*Sorden, supra,* 65 Cal.App.5th at pp. 589, 592, 595.) When the jury asked for the legal definition of "disturbing the peace," the trial court provided the *Nadkarni* definition. (*Sorden,* at p. 598.) *Sorden* rejected the defendant's suggestion that he could not have known,

18

when the section 1203.097 order was issued, that the prohibited conduct was defined by the " 'Family Law definition of disturbing the peace and not the Criminal Law definition in section 415.' "[11]  (*Sorden,* at p. 601.)  Among its reasons for rejecting the defendant's challenge to the instruction, *Sorden* relied on the *Burquet* court's statement (quoted *ante*) that the section 415/*Bushman* definition of disturbing the peace is not applicable to the phrase as used in the DVPA.  *Sorden* also noted that of the 11 cases it cited to demonstrate that the *Nadkarni* definition had been "applied consistently since 2009," "more than a half dozen . . . were established law without dissent, disagreement, or criticism." (*Sorden,* at pp. 601, 602.)

Fuentes maintains that it was reasonable for the *Sorden* court to find the DVPA definition of disturbing the peace applicable because the defendant was charged with violating a section 1203.097 protective order, which can only be issued in domestic violence cases.  The same reasoning cannot extend to the present case, he argues, because while section 136.2 allows issuance of a protective order under Family Code section 6320, that is not the only basis for a section 136.2 protective order.  But the fact that section 136.2 authorizes protective orders in cases that do not involve domestic violence (as well as cases that do) does nothing to alter the fact that the order *in this case* necessarily addresses domestic violence.  As we have said, this is clear from

---

[11] *Sorden* rejected the defendant's challenge to the instruction in part because of the manner in which he raised it.  The defendant argued there were no criminal cases adopting the *Nadkarni* definition, then asked how he was to know that definition applied to the protective order and whether the trial court in 2017 notified him of the *Nadkarni* definition.  *Sorden* stated that "merely asking rhetorical questions about proceedings in 2017 in a different case" did not establish error but rather resulted in forfeiture due to the failure to provide legal argument and citation to authority.  (*Sorden, supra,* 65 Cal.App.5th at pp. 601-602.)

19

the face of the order as well as the fact that it was issued in a case in which Fuentes pleaded guilty to willful infliction of corporal injury on a person with whom he had a dating relationship (§ 273.5, subd. (a)), and admitted personally inflicting great bodily injury upon the victim in circumstances involving domestic violence (§ 12022.7, subd. (e)).

In the circumstances of this case, there is no merit to Fuente's claim that the "average person" would understand the protective order directing him not to "disturb the peace" of Doe as prohibiting only conduct meeting the definition developed in the context of the criminal offense described in section 415—" 'disruption of public order by acts that are themselves violent or that tend to incite . . . violence.' " (*Burquet, supra,* 223 Cal.App.4th at p. 1145; *Bushman, supra,* 1 Cal.3d at p. 773.) Indeed, it seems questionable that the "average person" faced with a domestic violence protective order would be sufficiently well-versed in criminal law to view the directive not to disturb the peace of the protected party as prohibiting violent and violence-inciting conduct that disrupts public order and not conduct that, consistent with the ordinary meaning of the terms "disrupt" and "peace," destroys the protected person's mental or emotional calm and tranquility.[12]

---

[12] Fuentes points out that protective orders issued on forms designed for use in cases under the DVPA include language explaining the *Nadkarni* definition of disturbing the peace: DV-110 ("Temporary Restraining Order . . . (Domestic Violence Prevention)") and DV-130 ("Restraining Order After Hearing . . . (Domestic Violence Prevention)") state, after listing prohibited acts including "disturb the peace," " 'Disturb the peace' means to destroy someone's mental or emotional calm. This can be done directly or indirectly, such as through someone else. This can also be done in any way, such as by phone, over text, or online. Disturbing the peace includes coercive control." (DV-110, p. 3 <https://www.courts.ca.gov/documents/dv110.pdf> [as of Jan. 27, 2023]; DV-130, p. 4 <https://www.courts.ca.gov/documents/dv130.pdf> [as of Jan. 27, 2023].)

Fuentes's reliance on *In re G.B.* (2018) 24 Cal.App.5th 464 (*G.B.*) ignores the significance of context.[13]  *G.B.* held that a probation condition requiring the juvenile offender to have " 'peaceful contact with law enforcement' " and not " 'act aggressively toward law enforcement' " was unconstitutionally vague because it did not "give fair warning what conduct is required or prohibited" or "provide guidance as to what would constitute a violation."  (*Id.* at pp. 468, 474.)  *G.B.* explained that the dictionary definitions of "peaceful" (" 'untroubled by conflict, agitation, or commotion: quiet, tranquil,' or 'devoid of violence or force' ") and "aggressive" (" 'marked by' (a) 'combative readiness,' (b) 'obtrusive energy,' or (c) 'driving forceful energy or initiative' ")[14] "cover a wide range of potential behaviors," some of which could be seen as "not peaceful" or "aggressive" by some people while being seen as innocuous by others.  Referencing the juvenile court's comment that the condition did not abridge the juvenile's First Amendment rights, *G.B.* observed that one person might view "vociferous objections to police

Given the established legal definition and discernable ordinary meaning of the terms, we are not persuaded that the absence of this explicit definition on a criminal protective order issued in a domestic violence case renders the proscription against disturbing the peace of the protected party constitutionally vague.

[13]  *G.B.* addressed a condition requiring "peaceful contact" rather than one forbidding "disturbing the peace," and Fuentes discusses the case primarily in his argument concerning violation of the order of release as a basis for the *Cruz* waiver violation.  The case is nevertheless relevant to Fuentes's vagueness challenge to the protective order because the terms are obviously similar and, as we have said, the court that imposed the April 2020 protective order explained it to Fuentes as meaning "[y]ou are only to have peaceful contact."

[14]  The definitions quoted in *G.B.* are from Merriam-Webster's Collegiate Dictionary (11th ed. 2003).  (*G.B., supra,* 24 Cal.App.5th at p. 474.)

21

treatment as peaceably exercising constitutional rights, while another sees the same behavior as acting 'aggressively.' " (*G.B.,* at pp. 474-475.)

As Fuentes acknowledges, however, *G.B.* distinguished the condition requiring peaceful contact with law enforcement officers from conditions requiring peaceful contact with victims and witnesses: "We note restraining orders and probation conditions mandating 'peaceful contact' with witnesses or victims are common, and have been referenced in several published decisions. [Citations.] We have not encountered in our case law, however, any example of a probation condition requiring 'peaceful contact' with *law enforcement*, nor have the parties cited to one." (*G.B., supra,* 24 Cal.App.5th at p. 474, fn. 6.)

Fuentes correctly observes that *G.B.* and the cases it cited did not address the constitutionality of peaceful contact conditions in other circumstances. But the court's distinction of orders pertaining to a defendant's conduct toward a victim or witness highlights the fact that the condition in *G.B.* addressed a very different kind of interaction than a protective order in a domestic violence case. Unlike a citizen attempting to determine what constitutes "peaceful" contact with a law enforcement officer, a defendant subject to a domestic violence protective order is interpreting what is required of him within the context of a specific intimate relationship with the protected party. Fuentes was required not to "harass, strike, threaten, assault (sexually or otherwise), follow, stalk, molest, destroy or damage personal or real property, disturb the peace, keep under surveillance, or block movements of" Doe. Read as a whole, the prohibited conduct includes both overt violence and non-violent conduct that threatens, intimidates or otherwise disturbs the victim's ability to go about her life. "Harass," for example, means "to annoy persistently" or "to create an

22

unpleasant or hostile situation for, especially by uninvited and unwelcome verbal or physical conduct." (Merriam-Webster Online Dict. <https://www.merriam-webster.com/dictionary/harass> [as of Jan. 27, 2023].) Given the circumstances and prohibitory language as a whole, a reasonable person subject to a domestic violence criminal protective order could not reasonably question that the order to not disturb the peace of the victim means not just to refrain from violence and violence-inciting behavior but also to not destroy the mental or emotional calm of the victim of his domestic violence. (*Nadkarni, supra,* 173 Cal.App.4th at p. 1497).

### 3. *Substantial Evidence Supports the Finding that Fuentes Disturbed the Peace of Doe.*

Fuentes maintains that the protective order should be understood as using "disturb the peace" consistent with the definition used in prosecuting violations of section 415 and contends the evidence does not support finding his conduct satisfied that definition. As we have explained, we disagree with Fuentes's premise: In the domestic violence context, disturb the peace means destroying the calm of the protected party. Fuentes does not argue that the evidence is insufficient to demonstrate a violation under this definition. Clearly it is sufficient.

Doe, who acknowledged at the hearing that she was honest when she spoke with the police on June 23, 2020, told the officer that Fuentes yelled at her for 10 minutes, was "not peaceful" and was withholding her phone and internet access, and that she got scared because she thought he was going to hurt her. Doe testified that the argument that prompted her to go to the Family Justice Center lasted for over four hours, from around 8:30 a.m. until shortly before 1 p.m. She testified that Fuentes told her that "maybe [he] should have just been a little bit harder on [her]" in February, the incident that resulted in his conviction and in which he admitted inflicting great

23

bodily injury on Doe. Considering the degree of injury Fuentes caused Doe in that incident, his comment that he should have been harder on her was threatening and intimidating, as was yelling at Doe for a lengthy period. Although Doe tried to minimize Fuentes's conduct in her testimony at the hearing, the trial court found she was "substantially underplaying the significance of what occurred on June 23rd" and "was probably far more accurate with the officer on the day she reported to the Family Justice Center than she was today." Indeed, the trial court found Doe was "terrified" when she testified, "the textbook definition of a domestic violence victim."

We have no trouble concluding the evidence supported finding Fuentes violated the protective order and, therefore, the terms of his *Cruz* waiver.[15]

## II.

### *Post-Sentencing Statutory Amendments Require Resentencing.*

#### A. Senate Bill No. 567

Fuentes was sentenced to a nine-year prison term consisting of the aggravated term of four years for the conviction of inflicting corporal injury (§ 273.5) and the aggravated term of five years for the great bodily injury enhancement (§ 12022.7, subd. (e)). He contends that legislation enacted subsequent to his sentencing requires a remand for resentencing.

At the time Fuentes was sentenced, section 1170, subdivision (b), gave trial courts broad discretion to decide which of the three terms specified for an offense would best serve the interests of justice. (See former § 1170, subd. (b), as amended by Stats. 2020, ch. 29, § 14.) Here, the trial court

---

[15] This conclusion makes it unnecessary for us to resolve Fuentes's argument that the *Cruz* waiver violation could not be based on violation of a condition of his release because the *Cruz* waiver referred to violating conditions of "Supervised O.R. release" and the trial court did not follow the procedural requisites for a valid release on own recognizance (§ 1318).

imposed aggravated terms because it found that the factors in aggravation "far outweigh those in mitigation." The court stated: "In aggravation, there was a particularly vulnerable pregnant victim. There was a child in the house. The injuries were substantial. It was enough of a beating to take her to the ground and it didn't stop after that. And he has a lengthy history, criminal history with prior felony already." The court also noted as an aggravating circumstance that "prior to being sentenced, there was another incident that this Court would certainly classify as domestic violence in terms of its manipulative and controlling behavior." In mitigation, the court stated, "he entered a plea early on; however, the Court notes that plea agreement would have allowed him to be placed on probation, so he had great motivation to take responsibility early on."

Subsequent to Fuentes's sentencing, effective January 1, 2022, Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill No. 567) amended section 1170, subdivision (b), in a number of respects, one of which was to make the middle term of imprisonment the presumptive sentence. (§ 1170, subd. (b)(2); Stats. 2021, ch. 731, § 1.3.) Under the amended statute, "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (§ 1170, subd. (b)(1).) "A trial court may impose an upper term sentence only where there are aggravating circumstances in the crime and the defendant has either stipulated to the facts underlying those circumstances or they have been found true beyond a reasonable doubt. (§ 1170, subd. (b)(1)–(2).)" (*People v. Flores* (2022) 75 Cal.App.5th 495, 500.) The sentencing court can also rely on certified records of conviction without having to submit the prior convictions to the jury. (*Ibid.*; § 1170, subd. (b)(3).)

25

The parties agree that the Senate Bill No. 567 amendments apply retroactively to this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal. (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308; *People v. Flores* (2021) 73 Cal.App.5th 1032, 1039.) We concur.

## B.    Resentencing Is Appropriate.

The parties disagree as to the need for resentencing. The People maintain remand is unnecessary because the trial court relied in part on Fuentes's prior convictions in imposing the upper terms. Although the record in this case does not include certified records of Fuentes's priors, as section 1170, subdivision (b)(3), requires for the trial court to rely on a prior conviction without submitting it to the jury, the People argue the priors were established beyond a reasonable doubt by the 2016 plea agreement in SCR-665418, in which Fuentes pleaded no contest to two felonies and one misdemeanor,[16] and his admission in the present case that he was on probation in SCR-665418 when he committed the new offenses. The People suggest that Fuentes's admission that he was on probation "functionally admitted" the prior convictions, obviating the need for a certified record of conviction, and in any event a jury would undoubtedly have found the priors true. The trial court's reliance upon Fuentes's prior criminal history is sufficient to uphold the aggravated sentences, according to the People, because " '[i]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably

---

[16]  As earlier indicated, Fuentes's 2016 plea was to felony counts of recklessly fleeing a pursuing peace officer (Veh. Code, § 2800.2) and resisting a peace officer (§ 69) and a misdemeanor count of driving with a blood alcohol content of .08 with two prior convictions for driving under the influence within the last 10 years (Veh. Code, §§ 23152, subd. (b), 23546).

26

would have found true at least a single aggravating circumstance had it been submitted to the jury,' the error [in failing to submit the circumstance to the jury] is harmless." (*People v. Flores, supra,* 75 Cal.App.5th at p. 500, quoting *People v. Sandoval* (2007) 41 Cal.4th 825, 839.)

We need not resolve whether the records supports the trial court's reliance on Fuente's criminal history. Even if it did, the single aggravating circumstance test, by which *People v. Sandoval* applied harmless error review under *Chapman v. California* (1967) 386 U.S. 18 to denial of the right to a jury trial on aggravating circumstances that expose a defendant to an elevated sentence, does not fully address the issue under the amended section 1170, subdivision (b). The Senate Bill No. 567 amendments "chang[ed] the framework within which the trial court exercises its discretion by specifying a legislatively determined presumptive sentence. This means we must ask both whether we can be certain the jury would have found beyond a reasonable doubt the aggravating circumstances relied on by the court *and* whether the trial court would have exercised its discretion in the same way if it had been aware of the statutory presumption in favor of the middle term. (*People v. Lopez* (2022) 78 Cal.App.5th 459, 463, 466-467, fns. 10 & 11 [*Lopez*].)" (*People v. Wandrey* (2022) 80 Cal.App.5th 962, 982, review granted Sept. 28, 2022, S275942; *People v. Ross* (2022) 86 Cal.App.5th 1346, 1354-1355 (*Ross*).)[17]

" ' "[D]efendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more

---

[17] In *Ross,* another panel of the court that decided *People v. Flores, supra,* 75 Cal.App.5th 495, explained that upon reflection it was persuaded to "apply the two-step harmless error standard articulated in *Lopez.*" (*Ross, supra,* 86 Cal.App.5th at pp. 1354-1355.)

exercise that 'informed discretion' than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record." [Citation.]' (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; see *People v. Marquez* (1983) 143 Cal.App.3d 797, 803 ['an erroneous understanding by the trial court of its discretionary power is not a true exercise of discretion'].) Therefore, where a trial court cannot have acted with ' " 'informed discretion,' " ' 'the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." [Citations.]' (*Gutierrez*, at p. 1391.)" (*Lopez, supra,* 78 Cal.App.5th at p. 467; *Ross, supra,* 86 Cal.App.5th at p. 1354.)

Here, in addition to Fuentes's criminal history, the trial court cited several aggravating circumstances: the victim was particularly vulnerable, there was a child in the house, the victim suffered substantial injuries, and Fuentes committed another act of domestic violence between conviction and sentencing. Fuentes effectively stipulated to one of these, the victim's substantial injuries, by admitting the section 12022.7 enhancement for infliction of great bodily injury. But reliance on this aggravating circumstance would violate the proscription against dual use of facts by using the fact of the victim's substantial injuries to impose an aggravated term on the corporal injury conviction when it was also the basis of the section 12022.7 enhancement and/or to impose an aggravated term on the enhancement when it was an element of that enhancement. (*People v. Scott* (1994) 9 Cal.4th 331, 350 ["court generally cannot use a single fact both to aggravate the base term and to impose an enhancement, nor may it use a fact constituting an element of the offense either to aggravate or to enhance a sentence"]; Cal. Rules of Court, rule 4.420(h) ["A fact that is an element of the

28

crime on which punishment is being imposed may not be used to impose a particular term"].)

The other circumstances cited by the trial court were not stipulated to or found beyond a reasonable doubt, and we cannot confidently say a jury would have found all of them true beyond a reasonable doubt. (*Lopez, supra,* 78 Cal.App.5th at pp. 465-466.) Nor can we say there is no reasonable probability the trial court would have exercised its discretion in the same way if it had taken into account the statutory presumption in favor of the middle term.

The trial court's remarks at sentencing, especially in explaining why Fuentes would not be placed on probation, make it clear the court did not view Fuentes as deserving lenience: The court described the facts of his offense as "horrific"[18] and found it "unconscionable" that he "still could not conform to normality of appropriate behavior" with Doe while awaiting sentencing. But these remarks were specifically directed at the issue of probation: "I don't believe there are any extenuating circumstances that this Court could find that there was anything that warranted my placing of you on probation under those set of facts." Once the court determined that Fuentes was to be sentenced to prison, Fuentes was entitled to an exercise of the court's "informed decision" as to the length of the term he would serve.

---

[18] The court told Fuentes, "this was a negotiated agreement, [a section] 1192.5 agreement with the District Attorney's office. And originally that provided you the opportunity to be placed on probation under some pretty horrific facts. When I went back and read the presentencing report . . . the information is that you punched your wife 10 to 15 times in the face causing her to fall to the ground. And after she was there, kneed her to the front of her face four times which caused substantial great bodily injury to her. If that action wasn't bad enough, this occurred in the presence of the three-year-old child who was in the home, the child you now profess you need to be a role model for and provide parenting for."

While the trial court found the aggravating factors outweighed the only mitigating factor—which the trial court all but dismissed in significance—we cannot say there is no reasonable probability the court would have imposed a different sentence if it had been aware that it could not properly rely on all of the aggravating circumstances it cited and that any decision to impose an aggravated term would be a departure from a statutory presumption in favor of the middle term. (*People v. Wandrey, supra,* 80 Cal.App.5th at p. 982; *Lopez, supra,* 78 Cal.App.5th at pp. 466-467, fns. 10 & 11.) Accordingly, it is appropriate to remand for resentencing in light of the amendments to section 1170.

## DISPOSITION

The matter is remanded for resentencing in light of section 1170, subdivision (b), as amended by Senate Bill No. 567. In all other respects, the judgment is affirmed.

_____

STEWART, P.J.

We concur.

_____

RICHMAN, J.

_____

MARKMAN, J. *

*People v. Fuentes* (A162315)

_____

&ast; Judge of the Alameda Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

31

Trial Court:Sonoma County Superior Court

Trial Judge:        Hon. Shelly J. Averill

Counsel:

Jonathan D. Roberts, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, A. Natasha Cortina, Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.